The IRENE W. ALLEN.

THE CREST.

LAKE TANKERS CORPORATION v. GREAT LAKES DREDGE & DOCK CO., Inc.

No. A–14716.

District Court, E. D. New York.

Dec. 30, 1936.

Burlingham, Veeder, Clark & Hupper, of New York City (Stanley R. Wright, of New York City, of counsel), for libelant.

Barber, Matters, Gay & Vander Clute, of New York City (Russell C. Gay and Joseph Wynne, both of New York City, of counsel), for respondent.

BYERS, District Judge.

The libelant's motorvessel Irene W. Allen, to be called the Allen, stranded near the south bank of the Cape Cod Canal, on December 12, 1934, at a point approximately 1,500 feet west of Bourne Highway Bridge, while in the act of proceeding westerly through the canal. The time of the stranding was about 1:50 a. m. on a clear night, on which the wind was blowing out of the north, so as to affect the starboard side of the Allen, at a force of approximately 20 miles per hour.

The libel asserts that the dredge Crest and her owner should be held responsible because of the position of the dredge in the canal, which caused the Allen to attempt unsuccessfully to pass to the south of the dredge.

The important specifications of fault are: Obstruction of a narrow channel; failure to allow the Allen a practicable passage; failure to move to one side after notice of the Allen's approach; failure to sound any or proper signals; failure to do anything to facilitate a safe passage to the Allen.

It is uncontested that the dredge did not move to one side, and that no signals were sounded by either vessel, whereby it becomes unnecessary to discuss those matters.

The cause resolves itself into the questions of obstruction, and failure to allow a practicable or safe passage.

The original channel of the canal was 100 feet wide, and this was increased by dredging an additional 70 feet, on the south side of the old channel. The excavation was carried forward in two cuts of 35 feet each, called for convenience 1, and 2, the latter being alongside the original channel. While excavation was under way, the dredge operated in the number 1 cut at night (having completed the adjacent section of number 2) so as to afford the greatest width of navigable water to the large New York and Boston steamers which passed through at night.

The dredge was not excavating at the time in question, having completed that work in this part of the canal, but was "cleaning up," i. e., removing boulders and

shoals, so as to insure a uniform depth of 25 feet for the entire increased width of 170 feet.

The precise position of the dredge at the time in question is a contested issue.

It will be understood that the width of the canal from shore to shore, at this point, is a matter of about 450 feet, which means that, outside of the dredged portion, there is a depth which diminishes gradually toward the shore, in which navigation can be conducted depending upon the draft of the vessel involved.

The tide was ebb, i. e., under foot, as the Allen moved toward the west, at about ½ to *1* mile an hour. That been the condition at this place, for 45 minutes prior to the stranding.

The United States Engineer's office in Boston issued an Information Bulletin No. 6, Period from December 1, 1934, to December 15, 1934, from which the following are quoted:

"(1) The Dredge 'Crest' will be working between stations 340 and 400. It is completing a cut which increases the bottom width of the canal to 170 feet. Attendant tugs and scows are frequently in transit between the dredge and dumping grounds in Cape Cod Bay and Buzzards Bay. Work on this cut will be completed probably before December 10 and the 'Crest' will start on the new contract described in (2). It is expected that the dredge will clean up parts of the channel already covered."

"(6) All of the above mentioned plant will move to the side of the canal to permit the passage of any boat using the canal."

"(8) Accompanying sketch shows channel available and expected location of plant. Locations given above may be changed without notice."

The sketch referred to cannot be conveniently reproduced but shows the Crest about ½ mile west of the Bourne Highway Bridge, and perhaps 200 feet or so east of the new railroad bridge and at the southerly edge of the old 100-foot channel.

Thus vessels intending to use the canal had definite information as to the intended location of the dredge and her occupation.

The Allen is 209 feet long, 38 feet in beam, and drew about 9½ feet of water; she was light, i. e., in ballast, as she passed into the canal at the Cape Cod Breakwater. She was no stranger to these waters, having averaged two trips a week through the canal during the entire period of years that the dredging had been in progress; on only one such occasion had she passed south of the dredge, and that was after receiving a 2-whistle blast from the latter. On all other trips she had passed to the north without incident. No change in her command had taken place during this time, so far as the evidence discloses.

It cannot be found that she was instructed by the canal authorities to pass to the north on this occasion, because the boatman at the Cape Cod entrance, who said that he called through a megaphone to that effect, was shouting against the wind. No one called by the Allen admitted hearing the instruction.

Word of her approach was timely given to the dredge, which was cleaning up at station 357 lying in the number 2 cut; she is 167 feet long, and 48 feet in beam, and was held in position by three spuds. Her scow is 220 feet long and 44 feet wide. The bow end of the dredge was headed east.

Frank L. Hunt, in the employ of respondent as operator of the dredge, was on duty at about 1:15 a. m. when Inspector Kenneth Pierce, representing the War Department, i. e., the United States Engineers office, who was assigned to the dredge as such representative, having been informed that the Allen was then west of the Sagamore bridge, headed west, so informed Hunt and said: "for us to move the scow."

Hunt immediately suspended operations on the dredge, and caused the scow which was alongside to port to be dropped aft, so that she was moored astern of the Crest, with the tug Dempsey, in such a manner that, as these two vessels lay, they did not project into the channel further north than the port side of the dredge.

In about 15 minutes, the Allen arrived at the new Bourne Highway Bridge, and elected to pass to the south instead of to the north as had been her custom, and so stranded after she had passed clear of the dredge but not the scow.

The dredge was fully lighted, and she was clearly visible as the Allen came under the bridge, but, because of difficulty in making out a light on the railroad bridge which was said to have been relied upon as a range, the Allen miscalculated the true position of the Crest; her master said that he sensed difficulty in

passing to the north because he did not know how much water was available on that side, and he believed that the wind on his starboard hand was so strong that he could not there safely navigate. Thus he elected what would have been a starboard passing if the Crest had been moving east, but no whistles were blown, as has been stated.

The libelant urges that the Crest must be held for the damage occasioned to the Allen as the result of that maneuver.

The further fact is found that, at this part of the canal, there were numerous lighted mooring posts or dolphins, 250 feet apart, about 40 feet north of the north bank of the old channel, which were set into the bottom where there was an average depth of 11½ feet of water. This stretch of water was of course available to a vessel drawing 9½ feet, and she is chargeable with knowledge of it. The K. Whittelsey (C.C.A.) 64 F.(2d) 340, and cases cited at page 342.

Recurring now to the position of the dredge, it is found that Hunt's testimony and the blueprint produced by him are convincing to the effect that the Crest occupied the entire width of the number 2 cut (35 feet) plus a margin of 13 feet of the old 100-foot channel, being the amount by which her beam exceeded the width of the cut. This left 87 feet of 25-foot water and nearly 40 feet of 11½-foot water, or over 100 feet of sufficient depth to enable the Allen to pass safely, even with a wind of the force shown, affecting her starboard side.

Her captain testified that, under the conditions shown, he could pass safely in 90 feet (this is probably no understatement) and he had more. Thus far there has been no showing of cause to visit the Allen's stranding upon the dredge.

It is urged that the position of the dredge should be taken from a sketch attributed to Inspector Pierce, which shows the Crest about 22 feet more into the old channel than has been found above. Pierce was not a witness and the blueprint of his alleged sketch does not attain the status of evidence. Hunt was on the stand and, if Pierce in fact would be expected to contradict him, he should have been called for that purpose.

Further, the libelant seemingly relies in part upon the contract requirement (Respondent's Exhibit C) reading:

"There will be daily passages of large vessels. To accommodate such traffic, as in the opinion of the contracting officer's representative (Pierce in this case) demands it, the dredging plant shall provide a clear bottom width of 125 feet by moving close in to the southern bank of the canal."

The testimony quoted above, as to Pierce's instructions to Hunt, is consistent only with the former's apparent belief that all requirements of the Allen would be met by moving the scow 54 from alongside, to the position aft of the dredge which has been described.

Also the libelant urges that the instructions issued by the canal authorities, to Pierce, and which were binding upon Hunt, were, to give the Allen "full clearance." It is found that such were the instructions, but it is also found that this did not mean that the Crest was required to move laterally to the south side of the number 1 cut, to allow "full clearance" to the Allen.

The evidence is persuasive that by the teachings of common sense a practice had grown up to construe the term "full clearance" with reference to the dimensions of an approaching vessel. If the dredge had been required to move to the south slope of the channel in order to afford "full clearance" to every vessel, however small, the progress of the dredge's work would have been seriously hampered.

The Allen had passed the dredge safely probably one hundred times, and therefore her requirements as to full clearance were known and understood. If she had been handled properly on this occasion, there is no reason to think that she would have encountered difficulty.

Finally, it is urged that the Crest should be held because her position, whatever it was, did mislead the navigator of the Allen; that is to say, the dredge must be held to have assumed responsibility for whatever was decided on the Allen's bridge, with reference to her course, after she came in sight of the Crest. Probably this is another way of stating that the dredge should be held to answer for the natural and probable consequences of her position, if it was legally to be criticised.

In passing, it may be doubted whether, at a distance of 1,500 feet, the difference in the positions as testified to by Hunt, and as attributed to Pierce, would have really

influenced the decision of the Allen's master to pass to the south; probably he was more concerned with the force of the wind than with his observation of the dredge's position, and his inability to pick up the light upon which he relied for a range, on the new railroad bridge.

In that situation, he did nothing to indicate a sense of peril. He simply proceeded in an unconventional course, when his customary passage was in fact available, and unless the Crest in fact was guilty of fault, the responsibility for that decision cannot be visited upon her.

Pierce's instruction to Hunt (pursuant to the quoted provision of the contract) to move the scow alongside the dredge, means that *he* did not consider it necessary for the dredge itself to move over into the shore cut.

Probably that would not relieve Hunt of the duty to do that if the circumstances charged him with knowledge that it was requisite in order to afford full clearance to the Allen. Under the finding made, it was not necessary.

The evidence does not disclose just when it became apparent on the Crest that the Allen was laying a course to pass to the south, but obviously nothing could have been done on the dredge at that juncture to influence the Allen's decision, except to blow an alarm. It is reasonable to infer that none was blown, because even a passing south of the dredge might have been feasible if the Allen had been held close enough to the dredge and scow. There is some testimony that this could have been done, but no finding on the subject would be justified.

The cases cited by libelant have been examined but seem not to require discussion. In some, a dredge not operating at night, was held at fault where a collision occurred, because its position was held to obstruct navigation.

The Crest was operating on this night, and it has been found that the placing of the scow in the position stated, which increased the width of navigable water available on the north side by 44 feet, was a sufficient compliance with the known requirements of the Allen, to afford her full clearance between the dredge and the lighted dolphins which have been described.

In others, the peculiar conditions of wind, tide, tortuous channel, or the proximity of bridges or like structures, placed a heavier duty on the dredge, with reference to cumbersome tows, than is here shown.

In none of them does it appear that, in comparable circumstances, an error in navigation of the passing craft, whereby stranding occurred, has been visited upon a dredge not shown to have been at fault.

For failure of proof, the respondent may take a decree of dismissal with costs, to be settled on notice.

The foregoing will be deemed to constitute a sufficient compliance with Admiralty Rule 46½ (28 U.S.C.A. following section 723) unless proctors indicate otherwise upon settlement of the decree.